1   R.H. and L.M.H.
    20425 N. 7th St, Apt 1015
2   Phoenix, AZ 85024
    (602)616-6346
3   lori@aflairbylori.com

4   Petitioners

5

6                    IN THE UNITED STATES DISTRICT COURT

7

8                       FOR THE DISTRICT OF ARIZONA

9

10  L.H. , a Student, by and through
    Parents(s) L.M.H and R.H.,                   Civil No. CV-14-02212-Phx-
11                                                               JJT
                        Plaintiffs,              (Other Civil Action)
12
    vs.
13
    ARIZONA DEPARTMENT OF
14  EDUCATION, and John Huppenthal, in his       COMPLAINT; EXHIBIT 1;
    official capacity as Superintendent of       SUMMONS IN A CIVIL MATTER
15  Public Instruction; and DEER VALLEY
    UNIFIED SCHOOL DISTRICT, STATE
16  OF ARIZONA, and Dr. James R.
    Veitenheimer, in his official capacity as
17  Acting Superintendent of the Deer Valley
    Public Schools,
18
                        Defendant.
19

20

21                            **COMPLAINT**

22        Plaintiff R.H. ("Father"), L.M.H. ("Mother") individually and on behalf of their

23  minor child, L.H., ("Student", collectively "Plaintiffs"), hereby allege and aver as follows:

24  **I.    INTRODUCTION**

25     1.  On April 21, 22, 23, 24, and 25, 2014, an administrative hearing was conducted in case

26        number 14C-DP-022-ADE, pursuant to the Individuals with Disabilities Education Act

("IDEA"), 20 U.S.C. §1400, *et seq.*; 34 C.F.R. 300.1, *et seq.*; Arizona Revised Statute, Title 15, Chapter 7, Article 4; and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 regarding Plaintiffs allegations. No further appeal is available at the state administrative level. See A.A.C. R7-2-405(H)(8).

2. Plaintiff's hereby re-allege any and all allegations derived from their hearing evidence as well as through their pleadings in the administrative hearing process.

3. Plaintiff's hereby re-allege the following allegations made during the administrative hearing, and/or through their initiating hearing complaint, as follows:

   i) At L.H.'s 2011 IEP, DVUSD did not properly consider Extended School Year services (ESY) for the summer of 2012 intersession and/or reconvene the IEP team 45 days before the end of the school year to make an ESY decision based on collected data as agreed to between the parties.

      a. Each and every factual allegation in this instant complaint applies to each and every allegation of wrongdoing alleged herein and incorporate the record on appeal.

      b. At the December 2011 IEP, the school concluded they did not have data to make a decision about ESY for summer of 2012.

      c. At the December 2011 IEP, the school did not use predictive data, as allowed by state law, nor any other factors related to L.H.'s unique needs to make an ESY eligibility determination.

      d. The December 2011 IEP states that data will now be collected in order to determine ESY eligibility.

e.  DVUSD did not reconvene an IEP meeting 45 days before the end of the 2011/2012 school year to determine ESY eligibility.

ii) Special education services provided to L.H. during the 2011/2012 school year were inadequate to meet his unique needs; regarding speech/language services. In 2013, the offered services were further diluted.

a.  DVUSD failed to provide services for L.H.'s unique needs using peer-reviewed research as required by IDEA.

b.  DVUSD failed to provide language goals for L.H. Tests showed that L.H. was making no progress or falling further behind in the language skills.

c.  DVUSD failed to discuss how service minutes were reasonably calculated to provide an educational benefit.

iii) Parent was denied meaningful participation in the November 8, 2012, and November 29, 2012, IEP meetings.

a.  At the November 8, 2012, IEP meeting, parent was told that L.H. was not entitled to any special education services.

b.  At the November 8, 2012, IEP meeting, parent was told that they had no right to ask for any special education services.

c.  At the November 8, 2012, IEP meeting, parent was told that the school district would determine what special education services L.H. would receive.

       d.  At the November 29, 2012, IEP meeting, parent was told that L.H. was not eligible for ESY.  When parent asked to see the data used to make this determination, DVUSD failed to provide that data for the meeting and parent was told to put the request in writing to the district.

       e.  At the November 29, 2012, IEP meeting, parent stated that because the ESY data was not made available, parent's participation was inhibited therefrom.  The school district issued a PWN anyway stating that L.H. was not eligible for ESY.

       f.  One week before the November 29, 2012, IEP, parent made a written request for L.H.'s complete educational record in order prepare for the meeting.  DVUSD failed to fulfill this request before holding the IEP meeting.

iv) ESY for summer of 2013 not provided.  L.H.'s 2/28/13 IEP states that he is eligible for ESY services but ESY was not individualized by addressing the needs of L.H.

       a.  The 2/28/13 IEP states that L.H. is eligible for ESY.

       b.  The 2/28/13 IEP does not define what services will be provided for ESY, nor does it state what goals will be targeted for ESY.

       c.  The 2/28/13 IEP did not state the frequency, duration, modification and/or services L.H. needed.

       d.  DVUSD stated that ESY services would be determined after L.H. enrolled and began attending developmental preschool.

e. DVUSD did not reconvene another IEP meeting to amend the IEP to include ESY services.

v) L.H. was dis-enrolled unilaterally by Richard Gray (DVUSD) when he should not have been, which caused parents to not seek services.

a. On May 15, 2013, DVUSD issued a letter to parents stating that L.H. was being withdrawn for unexcused absences from developmental preschool.

b. L.H. was never enrolled in developmental preschool and therefore could not have been absent and should not have been withdrawn from the district.

c. Parents did not know they had a right to services, due to the school's actions.

vi) L.H. was withdrawn without knowledge or participation of L.H.'s family.

a. On May 15, 2013, DVUSD issued a letter to parents stating that L.H. was being withdrawn for unexcused absences from developmental preschool.

b. On May 16, 2013, DVUSD issued a Prior Written Notice for the withdrawal referenced above. This PWN was issued after L.H. was withdrawn, giving no time for parents to react or object.

vii) The Deer Valley Unified School District, ("DVUSD") failed to comply with the requirements of the IDEA when it denied parent's request for explanation and interpretation of their child's educational records. During the IEP meeting on November 29, 2012, DVUSD was asked to provide explanation and interpretation of

education records related to L.H.'s day-to-day speech and language services. They refused our request and instead attempted to impose arbitrary conditions in order to provide the information. This denial of the rights afforded to us under 34 CFR 300.613(a), impeded our ability to be meaningful participants in the IEP team that was task with making educational decisions for our child.

    a.  At the November 29, 2012, IEP meeting, parent was told that L.H. was not eligible for ESY. When parent asked to see the data used to make this determination, DVUSD refused to provide that data for the meeting and parent was told to put the request in writing to the district.

    b.  At the November 29, 2012, IEP meeting, parent stated that because the ESY data was not made immediately available, ESY had not been discussed enough to make an ESY decision. The school district issued a PWN anyway stating that L.H. was not eligible for ESY.

viii)    The DVUSD failed to comply with the requirements of the IDEA when it failed to measure L.H.'s actual progress toward his IEP goals by not collecting data ("as measured by therapist data collection") as required by L.H.'s goals in his IEP during the 2011/2012 school year, (34 CFR 300.324 (b)(1)(ii)(A)). This failure resulted in inaccurate reporting of progress. The information was then passed onto the IEP team which influenced decisions that were made during discussions related to the November 29, 2012, and the February 28, 2013, IEPs.

6

a. L.H.'s goals in the December 1, 2011, IEP state that goal accuracy is to be measured "over three consecutive therapy sessions. As measured by therapist data collection."

b. Neither the intermediate nor the final progress percentages in progress reports can be substantiated against actual therapist data.

ix) The DVUSD failed to comply with the requirements of the IDEA when it failed to measure L.H.'s actual progress toward his IEP goals by not collecting data ("as measured by therapist data collection") as required by L.H.'s goals in his IEP during the 2012/2013 school year, (34 CFR 300.324 (b)(1)(ii)(A)). This failure resulted in inaccurate reporting of progress. The inaccurate information was then passed onto the IEP team which influenced decisions that were made during discussions related to the November 29, 2012, and the February 28, 2013, IEPs.

a. L.H.'s goals in the December 1, 2011, IEP state that goal accuracy is to be measured "over three consecutive therapy sessions. As measured by therapist data collection."

b. Neither the intermediate nor the final progress percentages in progress reports can be substantiated against actual therapist data.

x) The October 2012 progress report was never given to parent. Progress report was only received after serving a subpoena for said document following our initial due process complaint. Had parent been informed, parent could have immediately requested new IEP goals. Instead, IEP was not revised until November 29, 2012, which was six weeks after goals were complete.

a. The October 2012 progress report was never provided to parent.

7

b. The October 2012 progress report was never placed into L.H.'s education file, and was therefore not provided to parents as part of any request for educational records.

c. The October 2012 progress was obtained by parent's only through a subpoena as part of the original due process complaint.

4. Plaintiffs were an aggrieved party in an administrative law judge's ("ALJ") September 2, 2014, Decision ("Decision"), attached as Exhibit "1".

5. The ALJ made the following Findings of Facts that are disputed in and through this complaint as inaccurate and/or unrelated to the legal analysis required by law and/or equitable considerations:

a. FOF2: The Multi-Discipline Evaluation Team ("MET") considered the results from a comprehensive developmental assessment performed by Respondent School District and found that [L.H.] exhibited age-appropriate skills in all areas except speech sound production: *"Without intervention, [L.H.]'s speech delay will likely impact his ability to develop effective communication skills in a classroom and to fully benefit from classroom instruction. Based on his areas of need, [L.H.] would have difficulty answering teacher questions, participating in classroom instruction/discussion and interacting with peers and adults in the classroom. [L.H.]'s cognitive/pre-academic concepts, adaptive behaviors, motor skills, and social/emotional skills are estimated to be within age appropriate limits and should not impede his ability to access an early childhood curriculum."* This qualified [L.H.] for eligibility under the IDEA category of Preschool Severe

Delay.  The team also found that [L.H.] *"would benefit from visual/voice output systems to help him express his wants/needs in the classroom."*  They recommended that [L.H.] "receive support services to address his communication delay" in a recommended setting of "developmental preschool with direct speech/language therapy services integrated into the classroom routine and activities."  As is evident, the goal of the recommendations was to allow [L.H.] to access education, not to remediate his disability. Again, Parents were notified of the procedural safeguards.

b. FOF3: On December 1, 2011, [L.H.]'s IEP team, which included Mother, met and created an IEP for [L.H.].  The IEP contains two speech goals addressing articulation skills (1) for vowels in isolation and (2) for consonants in simple combinations with vowels.  Progress was to be measured by therapist data collection. The IEP states that Parents would be informed of progress through progress reports, but does not state the frequency of those reports.  The record shows that progress reports were made quarterly.   Over the next six months, [L.H.] made some progress on his goals.

c. FOF4: Parents decided not to place [L.H.] in preschool; the recommended placement of developmental preschool was rejected.   Therefore, the IEP provides for speech services only and no academic placement. [L.H.] received those services twice weekly for 30 minutes each session.   Additionally, the IEP states that assistive technology was not necessary for [L.H.].   This is likely because such technology was intended to assist [L.H.] in the classroom, and [L.H.] was not going to be attending preschool.

9

d.   FOF5: The IEP states that Extended School Year ("ESY") services were considered, but because [L.H.] was just beginning special education, there was no data to support the need for such services.   Megan Dudley, the DVUSD Speech Pathologist that was [L.H.]'s therapist from December 2011 to November 2012, credibly testified that she planned to collect data and, if the data showed regression/recoupment issues, she could have called an IEP meeting later in the school year to discuss ESY for [L.H.].   Indeed, the evidence shows that she did collect data.   She did not call for an IEP meeting, because she did not feel that the data warranted it.   No one else on the team, including Parents, called for an IEP team meeting to discuss ESY that year.

e.   FOF9: On November 8, 2012, [L.H.]'s MET found that he remained eligible for special education when he became a kindergartener under the category of Speech Language Impairment ("SLI").   Mother participated in the MET meeting, although she wanted to talk about [L.H.]'s IEP.   She was informed that a separate meeting would address that issue.   Once again, Parents were informed of their procedural safeguards.

f.   FOF11: On November 29, 2012, the IEP team met again and created a new IEP for [L.H.].   This time, Mother attended with an advocate. They both participated in the meeting. There are two substantial sections with parental input in the 2012 IEP.

g.   FOF12: The new IEP noted that [L.H.] had met his two goals from his prior IEP. Four new speech goals were written,  one at the request of Mother.   Mother continued to reject developmental preschool for [L.H.].   Service minutes

remained the same, but the IEP added 60 minutes per quarter of speech
consultation with Mother to help with low-tech assistive technology devices.
Eligibility for ESY was discussed and denied based on progress report data from
before and after the prior summer.   Mother wanted to see specific data rather than
the percentages that were in the progress reports. The team did not have that data
on hand, but informed Mother that she could request it and that ESY could be
revisited later in the school year.  Mother took the position that, because that data
was not available at the meeting, ESY "was not discussed" at the November 29,
2012, IEP meeting.   However, the evidence shows that ESY was, indeed,
discussed at the meeting.

h.  FOF16: On February 28, 2013, [L.H.]'s IEP team met and created a new IEP for
[L.H.], based on the findings from the recent comprehensive evaluation.  Father
participated, but disagreed with the resulting IEP, particularly the IEPs placement
at a developmental preschool.

i.  FOF17: [L.H.]'s February 2013 IEP contained multiple goals in communication,
fine motor skills, and preschool communication skills including use of an assistive
device.  It also recommended placement at a developmental preschool as the least
restrictive environment to pursue those goals.   Finally, it determined that [L.H.]
was eligible for ESY in Summer 2013.

j.  FOF18: Parents rejected the 2013 IEP. Instead, they wanted the IEP team to
consider their "home-based program."  This consisted of intensive speech therapy
and music therapy services by private therapists hired by Parents, weekly trips to
the library, weekly attendance at church, group play time with family and friends,

field trips and shopping trips with Mother and brothers.  The IEP team met on April 23, 2013, to consider Parents' plan, but rejected it because it had no occupational therapy, no academic or pre-academic skills addressed, and no certified teacher.  In fact, Parents' program was quite correctly characterized as "an average family's activities in addition to speech therapy and music therapy." The members of the team other than Father (Mother did not attend the meeting) concluded that the developmental preschool setting would much better serve [L.H.]'s identified needs and give him a rich language environment within which to help him progress with his speech deficits.

    k.  FOF19: According to a Prior Written Notice ("PWN") that issued February 28, 2013, [L.H.] was to begin at the developmental preschool on March 11, 2013.  He did not attend on that date or thereafter. After [L.H.] did not attend for 10 consecutive days, Respondent School District withdrew him from the district. However, as required by the IDEA, Respondent School District continued to empanel [L.H.]'s IEP team in April 2013 and continued to offer him the placement and services in his 2013 IEP. Because Parents had indicated no interest in being educated under the 2013 IEP, Respondent School District reasonably concluded that [L.H.] would not be attending ESY. Parents never inquired about ESY for Summer 2013.

6.  If any of the disputed Findings of Facts are deemed to have been Conclusions of Law, Plaintiffs dispute same.

7. The Administrative Hearings Officer made the following Conclusions of Law that are disputed in and through this complaint as inaccurate, and/or unrelated to the legal analysis required by law and/or equitable considerations:

The Hearings Officer finds that the speech language pathologist was the best person to make the decision about whether or not L.H. should receive ESY services in the summer of 2012 and that the IEP team did not need to make this decision.

The Hearings Officer finds that L.H. made progress with the number of hours provided for speech services in his IEPs.

The Hearings Officer finds that parents were full participants in the November 8, 2012, and November 29, 2012, IEP meetings.

The Hearings Officer finds that Parents rejected the February 28, 2013, IEP, therefore the School District does not have to define ESY services as deemed necessary by the IEP.

The Hearings Officer finds that disenrollment of a child with an IEP is not an IDEA issue.

The Hearings Officer finds that L.H.'s withdrawal was a matter of state law and did not constitute a change in the 2013 IEP.

The Hearings Officer finds that there is no persuasive evidence that Parents were ever denied access to L.H.'s educational records.

The Hearings Officer finds that Plaintiffs failed to prove that that Respondent School District failed to collect data for L.H.'s progress on his 2011 IEP goals.

8. If any of the above disputed Conclusions of Law are deemed to have been Findings of Facts, Plaintiffs dispute same.

13

9.  The Hearings Officer committed reversible error by failing to conclude and/or find that Respondent School District failed to provide L.H. a FAPE because the 2011 IEP team "did not properly consider" Extended School Year ("ESY") services for Summer 2012.

10. The Hearings Officer committed reversible error by failing to conclude and/or find that Respondent School District failed to provide L.H. a FAPE because the services provided to L.H. during the 2011-2012 school year were inadequate.

11. The Hearings Officer committed reversible error by failing to conclude and/or find that Respondent School District failed to provide L.H. a FAPE because Parents were denied meaningful participation during two team meetings in November 2012.

12. The Hearings Officer committed reversible error by failing to conclude and/or find that Respondent School District failed to provide L.H. a FAPE because it failed to define the 2013 ESY services as required by the February 2013 IEP.

13. The Hearings Officer committed reversible error by failing to conclude and/or find that find that Respondent School District failed to provide L.H. a FAPE because it improperly withdrew L.H. in May of 2013.

14. The Hearings Officer committed reversible error by failing to conclude and/or find that find that Respondent School District failed to provide L.H. a FAPE because Respondent School District did not issue a Prior Written Notice ("PWN") prior to the withdrawal of L.H.

15. The Hearings Officer committed reversible error by failing to conclude and/or find that find that Respondent School District failed to provide L.H. a FAPE because Respondent School District "denied [Parents'] request for explanation and interpretation of [L.H.'s] educational records."

14

16. The Hearings Officer committed reversible error by failing to conclude and/or find that find that Respondent School District failed to provide L.H. a FAPE because L.H.'s progress on 2011 IEP goals was not properly measured by collection of data.

## II.    JURISDICTION AND VENUE

17. This Court has jurisdiction in this action pursuant to 28 U.S.C. § 1331 and 20 U.S.C. § 1415(i)(3)(A); 34 C.F.R. § 300.516(a), without regard to the amount in controversy.

18. This action arose in the District of Arizona, and venue is proper in Arizona based on 28 U.S.C. § 1391(b)(1) given the residence of the parties and 28 U.S.C. § 1391(b)(2) given the subject matter of this action.

## III.   PARTIES

19. Plaintiffs L.M.H., R.H. and L.H. are residents in the County of Maricopa, State of Arizona.  L.M.H. and R.H. are the natural parents of L.H., who is a minor born on July 29, 2008.

20. Defendant is Deer Valley Unified School District, which implements the State's Special Education Program pursuant to the IDEA, and the Arizona Department of Education.

## V.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court find and order as follows:

1. Reverse the decision in 14C-DP-022-ADE and deem Plaintiffs the prevailing party on substantive and procedural grounds on the bases alleged in this Complaint;

2. Award Plaintiffs reimbursement for past private educational and related expenses as allowable under the Individuals with Disabilities and Education Act (IDEA).

15

3. Plaintiffs are entitled to the reasonable attorneys' fees and costs in pursuit of 14C-DP-022-ADE;

4. Plaintiffs are entitled to the reasonable attorneys' fees and costs in pursuit of their attorneys' fees and costs in this instant litigation;

5. An award of attorneys' fees and costs in an amount demonstrated as appropriate and necessary by Plaintiffs;

6. Such other and additional relief deemed just and necessary by this Court.

RESPECTFULLY SUBMITTED this 6th day of October, 2014.

_____
R.H.

Plaintiff

_____
L.M.H.

Plaintiff

16

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

# Exhibit 1

## IN THE OFFICE OF ADMINISTRATIVE HEARINGS

|  |  |
|---|---|
| ▇▇▇, a Student, by and through Parents ▇▇▇ and ▇▇▇, | No. 14C-DP-022-ADE |
| Petitioners, |  |
| vs. |  |
| **Deer Valley Unified School District**, | **ADMINISTRATIVE LAW JUDGE DECISION** |
| Respondent. |  |

**HEARING:** April 21-25, 2014

**APPEARANCES:** Parents appeared on behalf of Petitioners; attorneys Jennifer MacClennan, Esq. and Shelby Lile, Esq., GUST ROSENFELD PLC, appeared on behalf of Respondent Deer Valley Unified School District ("DVUSD"), accompanied by designated representatives Richard Gray, Ph.D., Administrator, Special Education Services Department, DVUSD (former) and Cheryl Parker, ***, Special Education Services Department, DVUSD (current).

**HEARING RECORD:** Certified Court Reporter Carole A. Whipple, RPR, of GRIFFIN & ASSOCIATES LLC was present and recorded the proceedings as the official record of the hearing.[1]

**WITNESSES:**[2]

**Joint Witnesses: Megan Dudley**, Speech Language Pathologist (Limited), DVUSD; **Kendra Buringrud**, Speech Language Pathologist, DVUSD; **Linda Price-Barry**, Principal, West Wing School, DVUSD; **Michelle Warburton**, Intervention Specialist, DVUSD; **Cheryl Cooper**, Speech Language Pathologist, DVUSD; **Richard Gray**, Manager, Student Support Services, DVUSD; **Elizabeth Baker Djenic**, School Psychologist, DVUSD; **Nancy Persons**, Developmental Preschool Teacher; **Marty Doyle**, Assistive Technology Consultant, DVUSD; **Karey Ford**, Occupational Therapist, DVUSD.

---

[1] The parties stipulated that the court reporter record is the official record of the proceedings. An audio recording was also made by the Arizona Office of Administrative Hearings.
[2] Throughout the body of this Decision, proper names of Student, Parents, and Student's teachers are not used in order to protect the confidentiality of Student and to promote ease of redaction. Where necessary, pseudonyms (noted above in bold type) will be used instead. Pseudonyms are not used for administrators, service providers, evaluators, and other professionals.

**Petitioners' Witnesses:** ▆▆▆▆ **Mother;** ▆▆▆▆ **Father** (collectively "**Parents**"); **Patti Kirkland**, Early Childhood Manager, DVUSD; **Allison Gross**, Private Music Therapist; **Lynn Carahaly**, M.A., CCC-SLP, Private Speech Therapist, Independent Evaluator.

**Respondent's Witnesses:** None

**ADMINISTRATIVE LAW JUDGE:** Eric A. Bryant

Petitioners bring this due process action on behalf of Student, claiming that Respondent School District did not provide Student a free appropriate public education ("FAPE") due mainly to various alleged procedural errors.  Parents seek reimbursement for the costs of private provision of services.  The law governing these proceedings is the Individuals with Disabilities Education Act ("IDEA"), 20 United States Code ("U.S.C.") §§ 1400-1482 (as re-authorized and amended in 2004),[3] and its implementing regulations, 34 Code of Federal Regulations ("C.F.R.") Part 300, as well as the Arizona Special Education statutes, Arizona Revised Statutes (A.R.S.) §§ 15-761 through 15-774, and implementing rules, Arizona Administrative Code ("A.A.C.") R7-2-401 through R7-2-406.

*Procedural History*

Petitioners filed their initial due process complaint on December 2, 2013, raising approximately eleven claims.  They filed a motion to amend the complaint on February 14, 2014, seeking to add five new claims.  That motion was granted and the amended complaint accepted on February 19, 2014.[4]  On March 28, 2014, based on a motion to dismiss filed by Respondent School District, Claim 7 of the complaint was dismissed.[5]

The complaint, as amended, claims that Student was not provided a FAPE for school years 2011-2012 and 2012-2013.  Petitioners claim numerous procedural violations that occurred during those years in the process of creating Student's

---

[3] By Public Law 108-446, known as the "Individuals with Disabilities Education Improvement Act of 2004," IDEA 2004 became effective on July 1, 2005.
[4] ORDER GRANTING AMENDMENT OF COMPLAINT AND SETTING NEW HEARING DATES, issued Feb. 19, 2014.
[5] *See* ORDER GRANTING DISMISSAL OF COUNT 7 ONLY, issued March 28, 2014.

Individualized Education Programs ("IEPs").  Respondent School District denies all claims.

### Evidence and Issues at Hearing

The parties presented testimony and exhibits at a formal evidentiary hearing held over five days in April 2014.  The parties presented testimony from the witnesses listed above and provided pre-marked Exhibits as Joint Exhibits 1 through 59,[6] Petitioners' Exhibits, and Respondent School District's Exhibits.[7]  The Joint Exhibits were admitted by stipulation.  Petitioners' Exhibits were admitted as P1 through P86[8] and PM01 through PM14.[9]  Respondent School District Exhibits were admitted as R1 through R18.[10]

After the Exhibits and testimony were admitted, the parties submitted written arguments to the tribunal.  The final memorandum was filed on August 12, 2014. Petitioners make the following claims:[11]

1) Respondent School District failed to provide Student a FAPE because the 2011 IEP team "did not properly consider" Extended School Year ("ESY") services for Summer 2012.

2) Respondent School District failed to provide Student a FAPE because the 2011 IEP team did not properly consider assistive technology for Student.

3) Respondent School District failed to provide Student a FAPE because the services provided to Student during the 2011-2012 school year were inadequate: the number of hours of speech therapy was too few.

---

[6] Identified herein as J1 through J59.
[7] The Exhibits of record consist of thousands of pages of documentation, some of which are duplicative. The record contains exhibit lists from both parties for specific identification.
[8] Excluding P7, P9, P11, P23, P30, P38 - P40, P47, P50, P55 - P57, P60, P69, P77, and P80 - P84. In order to make the record as clear as possible, it is hereby noted that the Administrative Law Judge DID NOT admit Petitioners' Exhibits P9, P30, P47, P55, P69, P77, P82, and P83 for the reasons stated on the record. Exhibits P53 and P74 were admitted as demonstrative only. Exhibits P7, P11, P23, P32, P38-P40, P50, P56 - P57, P60 P80 - P81, and P84 were not offered.
[9] Excluding PM07 – PM09 and PM13.  PM07 – PM09 were not admitted. PM13 was not offered.
[10] Excluding R9, R11, and R15.  Exhibits R9, R11, R15, and R19 – R21 were not offered.
[11] Petitioners' claims have, in some cases, been re-worded by the Administrative Law Judge.  See, Ford v. Long Beach Unified Sch. Dist., 291 F.3d 1086, 1090 (9th Cir., 2002) (hearing officer may reorganize and restate issues in her own words as long as she addresses the merits of all issues).

3

4)  Respondent School District failed to provide Student a FAPE because the 2011 IEP does not state when progress reports will be given.

5)  Respondent School District failed to provide Student a FAPE because Student did not receive speech services the first week of school in August 2012.

6)  Respondent School District failed to provide Student a FAPE because Parents were denied meaningful participation during two team meetings in November 2012.

7)  [This claim was dismissed by the Administrative Law Judge on March 28, 2014.][12]

8)  Respondent School District failed to provide Student a FAPE because Student's 2013 MET team did not consider an Independent Educational Evaluation.

9)  Respondent School District failed to provide Student a FAPE because no "ESY plan" was created for Summer 2013.

10)  Respondent School District failed to provide Student a FAPE because Student was withdrawn from Respondent School District after being absent for 10 consecutive days in March 2013.

11)  Respondent School District failed to provide Student a FAPE because Respondent School District did not issue a Prior Written Notice ("PWN") prior to the withdrawal of Student.

12)  Respondent School District failed to provide Student a FAPE because Respondent School District "denied [Parents'] request for explanation and interpretation of [Student's] educational records."

13)  Respondent School District failed to provide Student a FAPE because Student's progress on 2011 IEP goals was not properly measured by collection of data.

14)  Respondent School District failed to provide Student a FAPE because Student's progress on 2012 IEP goals was not properly measured by collection of data.

---

[12] Because the parties maintain the original numbering of the claims in their post-hearing memoranda, the Administrative Law Judge does as well.

4

15) Respondent School District failed to provide Student a FAPE because Student's October 2012 progress report was not timely given to Parents.

16) Respondent School District failed to provide Student a FAPE because Respondent School District "subjected [Student] and his parents to retaliatory and discriminatory actions."

17) Respondent School District should reimburse expenses incurred by Parents for private speech services and private music therapy due to the failure of Respondent School District to provide a FAPE.

18) Respondent School District should provide Student compensatory education and services in the amount of 132 hours of speech language services, 132 hours of music therapy, and an augmentative communication device.

19) Respondent School District should be ordered to place Student in Parent's "home-based" program as his continuing placement.

### *Dismissal of Claims 10 and 16*

In its post-hearing response memorandum, Respondent School District argues that Claims 10 (withdrawal of Student) and 16 (retaliation and discrimination) are not IDEA claims.[13] The Administrative Law Judge agrees.

### *Claim 10*

Student received speech language services, and no other instruction, from Respondent School District starting in 2011 as a preschool-age child. On February 28, 2013, after Student's IEP team met and created an IEP, Respondent School District made an offer of FAPE to Student that included placement in its developmental preschool beginning March 11, 2013.[14] Parents rejected that placement and Student never attended the developmental preschool. After ten consecutive days of non-appearance at the developmental preschool, Respondent School District withdrew Student from it pursuant to A.R.S. § 15-901(A)(1), which states in part that "withdrawals" include "students absent for ten consecutive school days, except for

---

[13] Response to Petitioners' Opening Memorandum at 20, 24-26 (filed July 28, 2014).
[14] Exhibit J48.

5

excused absences. . . ." Claim 10 argues that this action by Respondent School District denied Student a FAPE.

Respondent School District's withdrawal of Student is a question of state law that does not fall within the IDEA. IDEA due process complaints must raise claims "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child. . . ."[15] Claim 10 does not. Therefore, Claim 10 does not raise an IDEA issue and is hereby dismissed.

*Claim 16*

Claim 16 raises a claim of discrimination by claiming retaliation against Petitioners starting in November 2012 after Mother "advocated for her son."[16] However, as Respondent School District rightly points out, the IDEA is not an anti-discrimination statute.[17] Discrimination claims are not within its purview. Therefore, Claim 16 is dismissed.

### *Decision on the Merits*

The Administrative Law Judge has considered the entire record, including the testimony and Exhibits,[18] and now makes the following Findings of Fact, Conclusions of Law, and Decision finding that Respondent School District provided a FAPE to Student.

### **FINDINGS OF FACT**

The claims made by Petitioners are based on actions that occurred from October 2011 through March 2013. Therefore, the following factual findings are focused on that period.

*School Year 2011-2012*

1. Student was three years old in October 2011 when he was first referred to Respondent School District.[19] After a screening and an evaluation of Student, a team

---

[15] 20 U.S.C. § 1415(b)(b)(A).
[16] Petitioners' Opening Memorandum ("POM") at 66-68 (filed June 26, 2014).
[17] *Ellenberg v. New Mexico Military Inst.*, 478 F.3d 1262, 1275 (10th Cir. 2007).
[18] The Administrative Law Judge has read and considered each admitted Exhibit, even if not mentioned in this Decision. The Administrative Law Judge has also considered the testimony of every witness, even if the witness is not specifically mentioned in this Decision.
[19] Exhibit J4.

6

of educators, parents, and a speech pathologist (the Multidisciplinary Evaluation Team or "MET"), met in November 2011 to determine whether Student was eligible for special education services.[20] As part of this process, and as required by the IDEA, Respondent School District informed Parents of their procedural safeguards.[21]

     2. The MET considered the results from a comprehensive developmental assessment performed by Respondent School District and found that Student exhibited age-appropriate skills in all areas except speech sound production:

> Without intervention, [Student]'s speech delay will likely impact his ability to develop effective communication skills in a classroom and to fully benefit from classroom instruction. Based on his areas of need, [Student] would have difficulty answering teacher questions, participating in classroom instruction/discussion and interacting with peers and adults in the classroom.
> [Student]'s cognitive/pre-academic concepts, adaptive behaviors, motor skills, and social/emotional skills are estimated to be within age-appropriate limits and should not impede his ability to access an early childhood curriculum.[22]

This qualified Student for eligibility under the IDEA category of Preschool Severe Delay.[23] The team also found that Student "would benefit from visual/voice output systems to help him express his wants/needs in the classroom."[24] They recommended that Student "receive support services to address his communication delay" in a recommended setting of "developmental preschool with direct speech/language therapy services integrated into the classroom routine and activities."[25] As is evident, the goal of the recommendations was to allow Student to access education, not to remediate his disability. Again, Parents were notified of the procedural safeguards.[26]

     3. On December 1, 2011, Student's IEP team, which included Mother, met and created an IEP for Student.[27] The IEP contains two speech goals addressing

---

[20] Exhibit J10.
[21] Exhibit J7.
[22] Exhibit J10 at 51 (hereinafter, page numbers of Exhibits will be given by using the Bates-stamp numbers without the preliminary letters and zeros).
[23] *Id.* at 42.
[24] *Id.* at 51.
[25] *Id.*
[26] *Id.* at 52.
[27] Exhibit J13.

articulation skills (1) for vowels in isolation and (2) for consonants in simple combinations with vowels.[28]  Progress was to be measured by therapist data collection. The IEP states that Parents would be informed of progress through progress reports, but does not state the frequency of those reports.[29]  The record shows that progress reports were made quarterly.[30]  Over the next six months, Student made some progress on his goals.[31]

  4.   Parents decided not to place Student in preschool; the recommended placement of developmental preschool was rejected.[32]  Therefore, the IEP provides for speech services only and no academic placement.  Student received those services twice weekly for 30 minutes each session.[33]  Additionally, the IEP states that assistive technology was not necessary for Student.[34]  This is likely because such technology was intended to assist Student in the classroom, and Student was not going to be attending preschool.[35]

  5.   The IEP states that Extended School Year ("ESY") services were considered, but because Student was just beginning special education, there was no data to support the need for such services.[36]  Megan Dudley, the DVUSD Speech Pathologist that was Student's therapist from December 2011 to November 2012, credibly testified that she planned to collect data and, if the data showed regression/recoupment issues, she could have called an IEP meeting later in the school year to discuss ESY for Student.[37]  Indeed, the evidence shows that she did collect data.[38]  She did not call for

---

[28] *Id.* at 88.
[29] *Id.* at 89.
[30] *Id.* at 87.
[31] *Id.*
[32] Testimony of Megan Dudley, Reporter's Transcript of Proceedings ("RTP"), Day 1 at 40 (April 21, 2014).  Contrary to Petitioners' assertion, Megan Dudley was a credible and reliable witness whose testimony is given significant weight.
[33] *Id.* at 39.
[34] Exhibit J13 at 91.
[35] Exhibit J10 at 51 (Student "would benefit from visual/voice output systems to help him express his wants/needs in the classroom").
[36] Exhibit J13 at 89; 93.
[37] RTP, Day 1 at 60.
[38] Exhibit J50.

8

an IEP meeting, because she did not feel that the data warranted it.[39]  No one else on the team, including Parents, called for an IEP team meeting to discuss ESY that year.[40]

6.  Speech services were provided one-on-one to Student throughout the remainder of the 2011-2012 school year.

*School Year 2012-2013*

7.  Ms. Dudley resumed providing speech services to Student under the IEP in August 2012.  She testified that she did not provide services to Student the first week of the school year, but did on the second week.[41]

8.  In November 2012, Respondent School District recognized that Student needed a new IEP because Student's 2011 IEP was set to expire in December 2012, and also that Student would turn age five during the year of the new IEP and be school-age for starting kindergarten in September 2013.  Because of this, Respondent School District set a MET meeting for November 8, 2012, to review the data and determine if Student needed further evaluation in order to determine school-age eligibility.[42]  In this type of situation, Respondent School District creates an IEP that will provide for transition from preschool to kindergarten.[43]  This requires that the team determine if Student has an eligible school-age disability, which disabilities can be different than eligible preschool disabilities.[44]

9.  On November 8, 2012, Student's MET found that he remained eligible for special education when he became a kindergartener under the category of Speech Language Impairment ("SLI").[45]  Mother participated in the MET meeting, although she wanted to talk about Student's IEP.[46]  She was informed that a separate meeting would

---

[39] RTP, Day 1 at 60.  *See also*, RTP, Day 1 at 63 (no evidence of regression upon returning to school in August 2012).
[40] *Id.* at 60.
[41] RTP, Day 1 at 64.
[42] Exhibit J18.
[43] Testimony of Megan Dudley, RTP, Day 1 at 80-81.
[44] *See* A.R.S. § 15-761(24) ("Preschool Severe Delay" only applies to a "preschool child") and A.R.S. § 15-761(34) ("Speech/Language Impairment" applies to kindergarten-age children and grades above).
[45] Exhibit J18.
[46] *Id.* at 117.

address that issue.[47]  Once again, Parents were informed of their procedural safeguards.[48]

10. After the MET meeting concluded and Student's continued eligibility for kindergarten was determined, the team began a meeting that same day to create a new one-year IEP.[49]  Discussion ensued, but due to time constraints, the remainder of the meeting was postponed to a later date.[50]

11. On November 29, 2012, the IEP team met again and created a new IEP for Student.[51]  This time, Mother attended with an advocate.  They both participated in the meeting.  There are two substantial sections with parental input in the 2012 IEP.[52]

12. The new IEP noted that Student had met his two goals from his prior IEP. Four new speech goals were written,[53] one at the request of Mother.[54]  Mother continued to reject developmental preschool for Student.[55]  Service minutes remained the same, but the IEP added 60 minutes per quarter of speech consultation with Mother to help with low-tech assistive technology devices.[56]  Eligibility for ESY was discussed and denied based on progress report data from before and after the prior summer.[57] Mother wanted to see specific data rather than the percentages that were in the progress reports.  The team did not have that data on hand, but informed Mother that she could request it and that ESY could be revisited later in the school year.[58]  Mother took the position that, because that data was not available at the meeting, ESY "was not discussed" at the November 29, 2012, IEP meeting.[59]  However, the evidence shows that ESY was, indeed, discussed at the meeting.

---

[47] Id.
[48] Id. at 114.
[49] Id. at 119.
[50] Id. at 120.
[51] Exhibit J23.
[52] Id. at 135-36 and 137.
[53] Id. at 140-41.
[54] Exhibit J24 at 157.
[55] Testimony of Megan Dudley, RTP, Day 1 at 90.
[56] Exhibit J23 at 144 and 142.
[57] Exhibit J24 at 158.
[58] Id.
[59] Exhibit J23 at 148.

13.  Student did not return to receive speech services after November 14, 2012.[60]

14.  On December 11, 2012, Student's MET determined to gather additional data about Student by obtaining a full psycho-educational evaluation, an occupational therapy evaluation, and an assessment for assistive technology.[61]  These evaluations were performed, along with an Independent Evaluation for Speech Therapy,[62] and another meeting of Student's MET occurred on February 4, 2013,[63] and continued over to February 7, 2013.[64]  Parents fully participated in the meetings.

15.  The resulting lengthy evaluation report[65] stated that Student was eligible for special education under the category of Developmental Delay, because he had significant delays in both communication development and physical development.[66]

16.  On February 28, 2013, Student's IEP team met and created a new IEP for Student, based on the findings from the recent comprehensive evaluation.[67]  Father participated, but disagreed with the resulting IEP, particularly the IEPs placement at a developmental preschool.[68]

17.  Student's February 2013 IEP contained multiple goals in communication, fine motor skills, and preschool communication skills including use of an assistive device.[69]  It also recommended placement at a developmental preschool as the least restrictive environment to pursue those goals.[70]  Finally, it determined that Student was eligible for ESY in Summer 2013.[71]

18.  Parents rejected the 2013 IEP.  Instead, they wanted the IEP team to consider their "home-based program."[72]  This consisted of intensive speech therapy

---

[60] Testimony of Megan Dudley, RTP, Day 1 at 73.
[61] Exhibit J26.
[62] Exhibits J28-J35.
[63] Exhibit J40.
[64] Exhibit J45.
[65] Exhibit J44.
[66] Id. at 334.
[67] Exhibit J48.
[68] Exhibit J49.
[69] Exhibit J48 at 376-79.
[70] Id. at 383.
[71] Id. at 380.
[72] Exhibit J51 and J52.

11

and music therapy services by private therapists hired by Parents, weekly trips to the library, weekly attendance at church, group play time with family and friends, field trips and shopping trips with Mother and brothers.[73]   The IEP team met on April 23, 2013, to consider Parents' plan, but rejected it because it had no occupational therapy, no academic or pre-academic skills addressed, and no certified teacher.[74]   In fact, Parents' program was quite correctly characterized as "an average family's activities in addition to speech therapy and music therapy."[75]   The members of the team other than Father (Mother did not attend the meeting) concluded that the developmental preschool setting would much better serve Student's identified needs and give him a rich language environment within which to help him progress with his speech deficits.[76]

19. According to a Prior Written Notice ("PWN") that issued February 28, 2013, Student was to begin at the developmental preschool on March 11, 2013.[77]   He did not attend on that date or thereafter.  After Student did not attend for 10 consecutive days, Respondent School District withdrew him from the district.[78]   However, as required by the IDEA, Respondent School District continued to empanel Student's IEP team in April 2013 and continued to offer him the placement and services in his 2013 IEP.  Because Parents had indicated no interest in being educated under the 2013 IEP, Respondent School District reasonably concluded that Student would not be attending ESY. Parents never inquired about ESY for Summer 2013.

## CONCLUSIONS OF LAW
### APPLICABLE LAW

*FAPE*

1. Through the IDEA, Congress has sought to ensure that all children with disabilities are offered a FAPE (free appropriate public education) that meets their individual needs.[79]   These needs include academic, social, health, emotional,

---

[73] Exhibit J53.
[74] Exhibit J55.
[75] *Id.* at 410.
[76] Exhibit J54.
[77] Exhibit J48 at 384.
[78] Exhibit J58.
[79] 20 U.S.C. §1400(d); 34 C.F.R. § 300.1.

communicative, physical, and vocational needs.[80]  To provide a FAPE, school districts must identify and evaluate all children within their geographical boundaries who may be in need of special education and services.  The IDEA sets forth requirements for the identification, assessment, and placement of students who need special education, and seeks to ensure that they receive a FAPE.  A FAPE consists of "personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction."[81]  The IDEA mandates that school districts provide a "basic floor of opportunity," nothing more.[82]  The IDEA does not require that each child's potential be maximized.[83]  A child receives a FAPE if a program of instruction "(1) addresses his unique needs, (2) provides adequate support services so he can take advantage of the educational opportunities and (3) is in accord with an individualized educational program."[84]

*The IEP*

2.  Once a student is determined eligible for special education services, a team composed of the student's parents, teachers, and others familiar with the student formulate an IEP (Individualized Education Program) that generally sets forth the student's current levels of educational and functional performance and sets annual goals that the IEP team believes will enable the student to make progress in the general education curriculum.[85]  The IEP tells how the student will be educated, especially with regard to the student's needs that result from the student's disability, and what services will be provided to aid the student.  The student's parents have a right to participate in the formulation of an IEP.[86]  The IEP team must consider the

---

[80] *Seattle Sch. Dist. No. 1 v. B.S.*, 82 F.3d 1493, 1500 (9th Cir. 1996) (quoting H.R. Rep. No. 410, 1983 U.S.C.C.A.N. 2088, 2106).
[81] *Hendrick Hudson Central Sch. Dist. Bd. of Educ. v. Rowley*, 458 U.S. 176, 204 (1982).
[82] *Id.*, 458 U.S. at 200.
[83] *Id.* at 198.
[84] *Park v. Anaheim Union High Sch. Dist.*, 464 F.3d 1025, 1033 (9th Cir. 2006) (citing *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 893 (9th Cir. 1995).
[85] 20 U.S.C. § 1414(d); 34 C.F.R. §§ 300.320 to 300.324.
[86] 20 U.S.C. § 1414(d)(1)(B); 34 C.F.R. §§ 300.321(a)(1).

strengths of the student, concerns of the parents, evaluation results, and the academic, developmental, and functional needs of the student.[87]

*Procedural Safeguards Notice*

3. To foster full parent participation, in addition to being a required member of the team making educational decisions about the student, school districts are required to give parents, at least once a year, a copy of the parents' "procedural safeguards," informing them of their rights as parents of a student with a disability:

> The procedural safeguards notice shall include a full explanation of the procedural safeguards, written in the native language of the parents (unless it clearly is not feasible to do so) and written in an easily understandable manner, available under this section and under regulations promulgated by the Secretary relating to--
> (A) independent educational evaluation;
> (B) prior written notice;
> (C) parental consent;
> (D) access to educational records;
> (E) the opportunity to present and resolve complaints, including--
> (i) the time period in which to make a complaint;
> (ii) the opportunity for the agency to resolve the complaint; and
> (iii) the availability of mediation;
> (F) the child's placement during pendency of due process proceedings;
> (G) procedures for students who are subject to placement in an interim alternative educational setting;
> (H) requirements for unilateral placement by parents of children in private schools at public expense;
> (I) due process hearings, including requirements for disclosure of evaluation results and recommendations;
> (J) State-level appeals (if applicable in that State);
> (K) civil actions, including the time period in which to file such actions; and
> (L) attorneys' fees.[88]

This requirement informs parents of their rights during the IEP creation process and allows them to educate themselves about the IDEA.

*ESY*

4. Disabled students are eligible for Extended School Year services if those services are necessary so that (1) the student will not severely or substantially regress

---

[87] 20 U.S.C. § 1414(d)(3)(A); 34 C.F.R. §§ 300.324(a).

14

in skills during recesses or the summer break, and (2) if the benefits gained by the student during the regular school year would be significantly jeopardized during school breaks without extended services.[89]  ESY is not appropriate to provide daycare or respite services to caregivers, for summer recreation, or to maximize academic potential.[90]  ESY is to be determined by the IEP team using retrospective data unless it is not available, in which case predictive data can be used.[91]

*Reimbursement for Parental Private School Placement*

5.  Parents who dispute whether an IEP provides a FAPE to a student, and who as a result enroll that student in a private program, may receive reimbursement for the costs of that private enrollment under certain circumstances.[92]  The program offered by the school district must fail to provide a FAPE to the student and the private school must be an "appropriate" placement.[93]  A private school placement may be appropriate even if it does not operate under public school standards.[94]  Under these circumstances, parents may "enroll the child in a private preschool, elementary school, or secondary school without the consent of or referral by the [school district]. . ." and seek reimbursement from the school district for the expense of that enrollment from a court or hearing officer.[95]  Indeed, parents have "'an equitable right to reimbursement for the cost of providing an appropriate [private] education when a school district has failed to offer a child a [free appropriate public education]."[96]  Furthermore, the placement does not have to meet IDEA requirements.[97]

---

[88] 20 U.S.C. § 1415(d)(2); *see also* 34 C.F.R. § 300.504(c).  Safeguards may also be posted on the Internet. 20 U.S.C. § 1415(d)(1)(B).
[89] A.R.S. § 15-881(A).
[90] A.R.S. § 15-881(D).
[91] A.R.S. § 15-881(B).
[92] 34 C.F.R. § 300.148.
[93] *Id.*
[94] *Id.*
[95] 34 C.F.R. § 300.148(b) and (c).
[96] *Union School Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir. 1994) (quoting *W.G. v. Bd. of Trustees*, 960 F.2d 1479, 1485 (9th Cir. 1992)).
[97] *Florence County. Sch. Dist. Four v. Carter*, 510 U.S. 7, 13 (1993).

15

6. However, an award for reimbursement can be reduced or denied in various circumstances.[98] An award may be reduced or denied if the parents have not given adequate notice as set forth in the IDEA.[99]

*Compensatory Education*

7. Compensatory education is an equitable remedy that may be awarded in appropriate cases wherein students have not been provided a FAPE.[100] Although the goal is to compensate a student for missed education or services, there is no obligation to provide day-for-day compensation for time missed.[101] Appropriate relief is that which is designed to ensure that the student is appropriately educated within the meaning of the IDEA.[102] Case-specific factors should be taken into account to craft an appropriate remedy.[103]

## DECISION

*Burden of Proof and Basis of Decision*

8. A parent who requests a due process hearing alleging non-compliance with the IDEA must bear the burden of proving that claim.[104] The standard of proof is "preponderance of the evidence," meaning evidence showing that a particular fact is "more probable than not."[105] Therefore, in this case Petitioners bear the burden of proving by a preponderance of evidence that Respondent School District failed to provide Student a FAPE through Student's 2011 IEP (as implemented beginning August 2011), 2012 IEP, and 2013 IEP. If a denial of a FAPE is shown, Petitioners must then show that they are entitled to the compensatory education they are requesting. To be reimbursed for a private parental placement, they must also show that the parental placement at On-Track Academy was appropriate.

---

[98] 34 C.F.R. § 300.148(d).
[99] 34 C.F.R. § 300.148(d)(1). *Anchorage School District v. M.P.*, 689 F.3d 1047, 1059 (9th Cir. 2012) lists other equitable factors that might reduce reimbursement, none of which have been raised here.
[100] *Parents of Student W. v. Puyallup Sch. Dist. No. 3*, 31 F.3d 1489, 1497 (9th Cir. 1994).
[101] *Id.*
[102] *Id.*
[103] *Id.*
[104] *Schaffer v. Weast*, 546 U.S. 49, 126 S. Ct. 528 (2005).
[105] *Concrete Pipe & Prods. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 622, 113 S. Ct. 2264, 2279 (1993) quoting *In re Winship*, 397 U.S. 358, 371-372 (1970); see also *Culpepper v. State*, 187 Ariz. 431,

9. This tribunal's determination of whether or not Student received a FAPE must be based on substantive grounds.[106] For substantive analysis of an IEP, this tribunal's review of the IEP is limited to the contents of the document.[107] Therefore, the question of whether an IEP is reasonably calculated to provide educational benefit to Student must be decided on the basis of the content of the IEP itself.

10. Procedural violations in and of themselves do not necessarily deny a student a FAPE. If a procedural violation is alleged and found, it must be determined whether the procedural violation either (1) impeded the student's right to a FAPE; (2) significantly impeded the parents' opportunity to participate in the decision-making process; or (3) caused a deprivation of educational benefit.[108] If one of those three impediments has occurred, the student has been denied a FAPE due to the procedural violation.

*Petitioners' Claims*

11. Petitioners' raise sixteen claims of violation of the IDEA and three claims for relief. Claims 7, 10 and 16 have already been addressed and dismissed. The other claims are addressed in turn.

### Claim 1: Respondent School District failed to provide Student a FAPE because the 2011 IEP team "did not properly consider" Extended School Year ("ESY") services for Summer 2012.

12. Petitioners argue that the IEP team did not "properly" consider ESY services when it created the December 2011 IEP[109] because it did not consider predictive data.[110] Respondent School District relies on the testimony of Megan Dudley to deny the claim. As the speech pathologist who was providing services to Student, she was

---

437, 930 P.2d 508, 514 (Ct. App. 1996); *In the Matter of the Appeal in Maricopa County Juvenile Action No. J-84984*, 138 Ariz. 282, 283, 674 P.2d 836, 837 (1983).
[106] 20 U.S.C. § 1415(f)(3)(E)(i); 34 C.F.R. §§ 300.513(a)(1).
[107] *Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 768 (6th Cir. 2001) ("only those services identified or described in the . . . IEP should have been considered in evaluating the appropriateness of the program offered) (relying on *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1526 (9th Cir. 1994) (IDEA requirement of a formal, written offer should be enforced rigorously)).
[108] 20 U.S.C. § 1415(f)(3)(E)(ii); 34 C.F.R. §§ 300.513(a)(2).
[109] Petitioners' attempt to undermine the reliability of the 2011 IEP through use of metadata from the software used to create the IEP is not persuasive. Petitioners failed to provide testimony from someone knowledgeable about the how the software works on a technical level.
[110] POM at 36-38.

17

in the best position to know whether he had issues of regression/recoupment, which is the basis for ESY.

13. Ms. Dudley testified that her plan was to collect data during the months subsequent to December 2011 and to see if there was an issue for which Student might need ESY services. This was a reasonable plan, given that Student was beginning speech therapy in December 2011 and had no prior data. Her testimony that she saw no evidence of the need for ESY later in the school year is found to be credible.

14. Petitioners argue that the severity of Student's speech disorder required ESY.[111] This is unpersuasive, as the IDEA focuses on a child's needs and not the child's disability category or diagnosis. No evidence has been provided that shows that Student had regression/recoupment issues in Summer 2012.

15. Claim 1 is not supported by the evidence.

Claim 2: Respondent School District failed to provide Student a FAPE because the 2011 IEP team did not properly consider assistive technology for Student.

16. Petitioners argue that the 2011 IEP team did not consider assistive technology for Student.[112] Even though the IEP states that this issue was considered and determined to not be needed, Petitioners' claim that it was not actually discussed at the IEP meeting.

17. Even if true, there is no showing that Student was harmed by it. Megan Dudley credibly testified about "low-tech" devices she used with Student to help him in therapy.[113] In addition, Student made progress during the year. Therefore, no procedural violation that harmed Student has been shown.

18. Petitioners' Claim 2 fails.

Claim 3: Respondent School District failed to provide Student a FAPE because the services provided to Student during the 2011-2012 school year were inadequate: the number of hours of speech therapy was too few.

---

[111] *Id.* at 38.
[112] POM at 38-40.
[113] RTP, Day 1 at 48-52.

18

19. Petitioners argue that the number of hours of speech services given to Student in the 2011 IEP were "inadequate."[114] They state this with regard to the 2013 IEP too.[115] Petitioners support this argument with an American Speech-Language Hearing Association ("ASHA") Technical Report on Childhood Apraxia of Speech and the opinion of Speech Therapist Lynn Carahaly. However, neither of these support Petitioners' argument.

20. It is important to understand that the IDEA mandates special education and services that are required in order for a child to access education and make progress in the curriculum.[116] Thus, Respondent School District is not required to remediate Student's disability. Lynn Carahaly is a fine evaluator and a knowledgeable witness, but her opinion in this case was based on a standard that is not consistent with requirements under the IDEA. In her evaluation report, her recommendations were for what was "medically necessary" for Student and what she thought was "clinically appropriate" within "generally accepted standards of therapeutic practice."[117] Her testimony at hearing was similar. There is nothing wrong with that standard; but, it is not the standard that Respondent School District is required to adhere to by the IDEA.

21. Moreover, the ASHA Technical Report answers the question of how to treat Childhood Apraxia of Speech. Thus, it is not persuasive. Respondent School District is not required to treat Student's disability.

22. The evidence shows that Student made progress with the number of hours provided for speech services in his IEPs. No persuasive evidence showing that Student could not receive some benefit from those hours was presented. Therefore, Claim 3 fails.[118]

**Claim 4: Respondent School District failed to provide Student a FAPE because the 2011 IEP does not state when progress reports will be given.**

---

[114] POM at 40-46.
[115] *Id.*
[116] *See Rowley*, 458 U.S. at 200.
[117] Exhibit J30 at 215.
[118] Furthermore, Petitioners' arguments based on district job descriptions are unpersuasive.

19

23. Petitioners' claim that the absence of a statement regarding the frequency of progress reports in the 2011 IEP is a denial of a FAPE.[119]  While it is true that such a statement is not in the 2011 IEP, credible evidence shows that Megan Dudley gave Parents progress reports.[120]  Thus, no harm has been shown.

24. Claim 4 is not a violation that deprived Student of a FAPE.

Claim 5: Respondent School District failed to provide Student a FAPE
because Student did not receive speech services the first week of school
in August 2012.

25. Petitioners argue that the fact that Student did not receive speech therapy the first week of school in August 2012 is a denial of a FAPE.  However, Petitioners have not shown a material failure to implement the IEP.

26. In order to prevail on this argument, Petitioners must show that the failure to implement a provision of an IEP is a material failure.[121]  A material failure occurs "when there is more than a minor discrepancy between the services provided to a disabled child and those required by the IEP."[122]  The failure to provide speech services for one week out of the school year, in this case, is not a material failure.  Claim 5 is not persuasive.

Claim 6: Respondent School District failed to provide Student a FAPE
because Parents were denied meaningful participation during two team
meetings in November 2012.

27. Parents claim that they were denied the opportunity to meaningfully participate in the two meetings held in November 2012.[123]  The evidence does not support this claim.

28. From October 2011, Parents were informed about their procedural safeguards, as required by the IDEA.  This is because the IDEA treats parents as full participants in the decision-making process and in order to be that, parents must be informed.  So, while the IDEA provides many rights for parents, it also creates

---

[119] POM at 46-47.
[120] Testimony of Megan Dudley, RTP, Day 1 at 62.
[121] *Van Duyn v. Baker Sch. Dist.*, 502 F.3d 811, 811 (9th Cir. 2007).
[122] *Id.*
[123] POM at 47-50.

20

responsibilities for parents to get informed about the process and their child's education, so that they can be full participants.  If a parent fails to do so, and then feels lost during a meeting, it is not the school district's fault.

29.  Here, the evidence shows that Parents were provided the information required by the IDEA in order to be full participants in the process.  In addition, the evidence shows that Parents were full participants in the process.  There is not sufficient evidentiary support for Claim 6.

<u>Claim 8: Respondent School District failed to provide Student a FAPE because Student's 2013 MET report did not include the recommended hours of services in an Independent Educational Evaluation.</u>

30.  Petitioners argue that Student's 2013 MET Report failed to include the recommended hours of speech services in Lynn Carahaly's evaluation.[124]  Because of this, they argue, the 2013 IEP team did not have that information to consider.

31.  The Administrative Law Judge has already found that the recommendations in question were based on a standard that is not applicable to Respondent School District.  Therefore, even if the 2013 IEP team was unaware of those recommendations, this could not have harmed Student's rights under the IDEA.  Claim 8 fails.

<u>Claim 9: Respondent School District failed to provide Student a FAPE because no "ESY plan" was created for Summer 2013.</u>

32.  Petitioners argue that Respondent School District's failure to create an "ESY plan" denied Student a FAPE.[125]  Petitioners have not cited any legal authority requiring Respondent School District to create "ESY plans."  The 2013 IEP concluded that Student was eligible for ESY in 2013.  However, Parents rejected that IEP because it did not adopt their "home-based" program.  To then turn around and claim that Respondent School District should have implemented the ESY portion of the IEP is inconsistent.

33.  Claim 9 is not supported by legal authority, nor is it consistent with the facts of record.  Thus, it fails.

---

[124] POM at 50-51.
[125] POM at 52-54.

21

**Claim 11: Respondent School District failed to provide Student a FAPE because Respondent School District did not issue a Prior Written Notice ("PWN") prior to the withdrawal of Student.**

34.   Petitioners argue that Respondent School District was required to issue a PWN before Student was withdrawn in April 2013.[126] This argument confuses the purpose of a PWN.

35.   School districts are required to give parents written notice when proposing any changes to the IEP.[127] Student's withdrawal was a matter of state law and did not constitute a change in the 2013 IEP.  Therefore, Claim 11 is unsupported by law.

**Claim 12: Respondent School District failed to provide Student a FAPE because Respondent School District "denied [Parents'] request for explanation and interpretation of [Student's] educational records."**

36.   Petitioners' argue that Respondent School District denied access to Student records when, during the November 29, 2012 IEP meeting, the data underlying the progress reports was not available.[128] The Administrative Law Judge finds that there is no persuasive evidence that Parents were ever *denied* access to Student's educational records.

37.   Claim 12 fails for lack of evidence.

**Claim 13: Respondent School District failed to provide Student a FAPE because Student's progress on 2011 IEP goals was not properly measured by collection of data.**

38.   Petitioners argue that Respondent School District failed to collect data for Student's progress on his 2011 IEP goals.[129] As the Findings of Fact show, Petitioners failed to prove this claim.

**Claim 14: Respondent School District failed to provide Student a FAPE because Student's progress on 2012 IEP goals was not properly measured by collection of data.**

---

[126] POM at 60-61.
[127] 20 U.S.C. § 1415(b)(3); 34 C.F.R. § 300.503.
[128] POM at 62-63.  This argument is stated in a confusing and contradictory manner, as it seems to change with each sentence.  The Administrative Law Judge has re-stated what he believes to be the argument that was intended.
[129] POM at 63-65.

22

39.  Petitioners make the same argument as in Claim 13, but with regard to Student's 2012 IEP.[130]  Once again, the evidence does not support the claim.

<u>Claim 15: Respondent School District failed to provide Student a FAPE because Student's October 2012 progress report was not timely given to Parents.</u>

40.  Finally, Petitioners argue that an October 2012 progress report was not given to Parents in a timely manner.[131]  Petitioners cite no factual or legal authority to support this claim.

*Remedies*

41.  Petitioners' last three claims concern remedies that are available when a violation of IDEA has occurred.  Because the evidentiary record does not show a violation of the IDEA, the Administrative Law Judge need not address the requested remedies.

## DECISION

Based on the findings and conclusions above, IT IS HEREBY ORDERED that this IDEA due process complaint, as amended, be denied.


Done this day, September 2, 2014.

/s/  Eric A. Bryant
Administrative Law Judge Pro Tem


## RIGHT TO SEEK JUDICIAL REVIEW

Pursuant to 20 U.S.C. § 1415(i) and A.R.S. § 15-766(E)(3), this Decision and Order is the final decision at the administrative level.  Furthermore, any party aggrieved by the findings and decisions made herein has the right to bring a civil action, with respect to the complaint presented, in any State court of competent jurisdiction or in a district court of the United States.  Pursuant to Arizona Administrative Code § R7-2-

---

[130] POM at 665.

23

405(H)(8), any party may appeal the decision to a court of competent jurisdiction within thirty-five (35) days of receipt of the decision.

---

[131] POM at 66.

24

Copy sent by **electronic mail** and regular mail
this 3rd day of September, 2014, to:



Jennifer MacLennan, Esq.
Shelby Lile, Esq.
Gust Rosenfeld, P.L.C.
201 E. Washington St., Ste. 800
Phoenix, AZ 85004-2327
**maclennan@gustlaw.com**
**slile@gustlaw.com**

Transmitted electronically to:

Kacey Gregson, Deputy Director of Legal Services
Arizona Department of Education
**kacey.gregson@azed.gov**

By:  Cruz Serrano

25